UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA**,

              Plaintiff,                  **CRIMINAL NO.  07-CR-20627**

v.                                    **HON. MARIANNE O. BATTANI**

**D-1 ALAN M. RALSKY,**

              Defendant.

_____/

### GOVERNMENT'S SENTENCING MEMORANDUM
### AND MOTION FOR DOWNWARD DEPARTURE

The United States, by and through its attorneys, TERRENCE BERG, United States

Attorney, THOMAS DUKES and MONA SEDKY SPIVACK, Trial Attorneys for the United

States Department of Justice's Computer Crime & Intellectual Property Section, hereby submit

this Sentencing Memorandum and Motion for a Downward Departure.

### The Charges and Description of the Offense

On June 22, 2009, defendant Alan Murray Ralsky pleaded guilty to Counts 5, 6, 13, and

28 of the Indictment.  Count 5 charged a conspiracy to commit wire fraud, mail fraud, and to

violate the CAN SPAM Act, in violation of 18 U.S.C. §§ 371, 1341, 1343, 1037(a)(2) and (a)(3).

Count 6 charged a violation of the CAN SPAM Act,18 U.S.C. §§ 1037(a)(2), (b)(2)(C).  Count

13 charged wire fraud involving a financial institution, in violation of 18 U.S.C. § 1343.  Count

28 charged money laundering, in violation of 18 U.S.C. § 1957.

In December 2007, Ralsky was indicted, along with 10 other individuals, for his role in a

criminal conspiracy to carry out an illegal e-mail stock market manipulation, or "pump and dump,"scam.  As set forth more fully in the indictment, from in or about May 2005 through September 2005, Ralsky conspired with co-defendants Judy Devenow, Scott Bradley, John Bown, William Neil, Anki Neil, James Fite, James Bragg, and Peter Severa (who comprised the mailing operation), along with co-defendants Francis Tribble and How Wai John Hui (who comprised the market manipulation/stock promotion operation), in order to send tens of millions of "spam," or unsolicited bulk commercial e-mail messages, each day that touted certain thinly traded Chinese penny stocks.  The spam campaign artificially increased the stock prices, as the recipients of the spam responded to the advertisements by purchasing the touted penny stocks. The co-conspirators and their Chinese-based clients then sold their large blocks of stock at these artificially high prices, garnering tens of millions of dollars in stock sale proceeds.  The Indictment identifies nearly $3 million in illegally-derived proceeds from this scheme.  The co-conspirators transferred these proceeds into and out of accounts with financial institutions in Hong Kong, China, and the United States.

Ralsky and his co-conspirators used illegal techniques to send their stock spam in an effort to evade anti-spam filters and ensure that the spam successfully arrived in the recipients' e-mail in-boxes.  For example in their outgoing stock spam, the co-conspirator mailers inserted false information into the "from" lines in the e-mail's return address, or "header," that falsely identified the sender of the spam.  They also sent the stock spam through "proxy" computers, which involved relaying or "bouncing" the e-mail through the computers of other people without authorization.  The use of these proxy computers disguised the true identity of the sending computers' Internet Protocol addresses by replacing them with the Internet Protocol addresses of

the proxy computers.  In addition to using false headers and proxies to send their spam in

violation of the CAN-SPAM Act, Ralsky and his co-conspirators sent spam e-mail messages that

contained materially false and misleading information or omissions.  For example, in some

instances, the spam falsely claimed that the touted stock involved an "initial public offering."  In

others, the spam did not contain the required disclaimers that disclosed the identities and

ownership interests of the sellers and senders of the spam.  Ralsky was aware that interstate wire

communications, the U.S. mail, and common carriers were used to further the fraudulent scheme.

### Ralsky's Role in the Conspiracy

Alan Ralsky was the top leader of the illegal spamming operation.  Ralsky developed the

business relationships with the clients on whose behalf he would send spam, and located and

recruited "mailers" who would be responsible for ensuring that the spam successfully landed in

recipients' in-boxes.  Using his longstanding and extensive contacts in the underground

spamming community, Ralsky found and hired dozens of third-party mailers located around the

world who sent Ralsky's spam from their own computers.  These included co-defendants Bragg

and Fite, as well as co-defendant Peter Severa, the Russian national who was ultimately one of

Ralsky's most prolific spammers.  Ralsky also helped set up an in-house spamming operation at

a California "colocation" facility, operated by co-conspirators Bown and Neil.  That operation

consisted of several full-time employee mailers, as well as the hardware, software, networking

capabilities, Internet bandwidth, and other spamming equipment needed to send an tens of

millions of spam e-mail messages on a daily basis.

Ralsky provided dozens of his own computer servers to be used in the California "colocation" facility. He acquired various spamming software programs that allowed the mailers to send spam in an automated fashion using "proxies" and falsified headers, and provided those to his third-party and in-house mailers. Ralsky also found and purchased sources of "proxies," and provided those to his mailers. He arranged for the acquisition of domain names using falsified registration information so that recipients and ISPs could not trace the spam back to Ralsky. He then provided these domains to his mailers for use in sending the spam.

In or about the spring 2005, Ralsky, who also has a background in selling securities, met with prospective clients, co-defendants John Hui and Frank Tribble, and agreed to send spam that promoted certain Chinese penny stocks in order to drive up the stock price, so that they could unload large blocks of their clients' stock and in turn earn significant profits. Per their arrangement, Ralsky received a percentage of the profits generated from selling the touted stock, earning additional bonuses when certain target stock prices were hit. Hui, who entered a guilty plea on December 16, 2008, to Counts 5, 13, and 28 of the Indictment, was the CEO and major shareholder of China World Trade (ticker symbol "CWTD"), one of the first Chinese companies to have its stock price manipulated in the conspiracy. Tribble, who entered a guilty plea on October 17, 2008, to Counts 5, 13, and 28 of the Indictment, was an experienced stock promoter and market manipulator who had a preexisting business relationship with Hui and with the U.S.-based stock broker who executed the stock trades on behalf of the conspiracy. Devenow, who entered a guilty plea on October 14, 2008, to counts 5 and 6 of the Indictment, was a key mailer for the spamming operation and helped manage other mailers. After seeing how successful Ralsky's spamming efforts were in driving up the stock price of CTWD, Hui and Tribble

brought other Chinese clients to Ralsky to promote, and inflate the prices of, their companies' stock. These included China Digital Media Corporation (ticker symbol "CDGT"), Pingchuan Pharmaceutical Inc. (ticker symbol "PGCN"), and World Wide Biotech & Pharmaceutical Company (ticker symbol "WWBP"), among others.

Ralsky's son-in-law and co-conspirator, Scott Bradley, actively monitored the brokerage accounts to verify the trading activity, and he would regularly report this activity to Ralsky. After the proceeds from the stock trades were deposited into the straw man nominee accounts, they would next be wired to Hong Kong and other overseas banks, and from those banks to Bradley's Michigan bank account, for distribution to other co-conspirators. Ralsky, Bradley, Hui, and Tribble regularly exchanged numerous emails during the course of the conspiracy to discuss the timing of the spam campaigns, the timing of the "news releases," as well as the distribution of proceeds from the stock sales following the spam campaigns.

Throughout the conspiracy, Ralsky was a member of the control group that consisted of co-conspirators Scott Bradley, John Hui, and Frank Tribble. Ralsky was copied on significant emails, set up and attended group meetings in Las Vegas and New York City, and participated in key decisions regarding the operation of the stock market manipulation conspiracy. As such, Ralsky was privy to detailed information about the inner workings of the pump-and-dump scheme. Ralsky earned significant income from his involvement in the conspiracy, in large part because he was paid a percentage of the stock sale proceeds, rather than a salary. Financial records obtained during the course of the investigation of this case indicate that Ralsky earned between approximately $400,000 and $1 million dollars during the course of his involvement in the conspiracy.

The evidence supporting the above facts consists primarily of internal email and electronic chat communications among the conspirators, records and documents seized from the conspirators, bank records, expert analysis of emails sent during the spam campaigns, and information obtained from cooperators.   In addition, Tribble, Devenow, and Hui have provided information to the government corroborating this evidence and the role of Ralsky as described above.

## Guidelines Calculations

Ralsky has a base offense level of 7, with a 14-level increase based on his $400,000-$1 million gain from his illegal activities.  Records seized in the investigation show that Ralsky was paid a significant percentage of the stock sale proceeds during the course of his involvement in the conspiracy during the spring and summer of 2005.  However, Ralsky paid a significant portion of his share of the proceeds to cover expenses, including expenses for his third-party mailers as well as for the in-house spamming operation based in Los Angeles.  From his share, he also paid Bradley and Devenow.  Because the loss to any individual spam recipient is virtually impossible to measure, the application of § 2B1.1(b)(1) of the Sentencing Guidelines should be based on the defendant's gain.

Ralsky, as with the other defendants who have already plead guilty, has a 2-level increase because the conspiracy involved mass marketing and more than 10 victims.  Further, he has another 2-level increase because the conspiracy involved sophisticated means.  These sophisticated means include Ralsky's and his co-conspirators' use of complex mailing techniques that employed the use of proxies, false headers, and advanced spamming software that automated these features; the use of dozens of computer servers that frequently moved

throughout the country and were ultimately based in California; the hiring of spammers located throughout the U.S. and in Russia and other countries; the involvement of Chinese individuals, companies, and banks to facilitate the scheme; and the transfer of funds from U.S. to Hong Kong to Chinese bank accounts.  He also has a 1-level increase because he was convicted under the money laundering statute.

Finally, Ralsky has a 4-level increase because he acted as an organizer/leader of the conspiracy.  As set forth above, he was the CEO and ringleader of the spamming operation, he was the leader of the control group, was a key deal maker who hooked up the other key participants in this conspiracy, and he was instrumental in finding a steady diet of Chinese companies to the stock manipulation/spam scheme.  In particular, Ralsky at times directed Bradley, Devenow, Bown, Neil, as well as a whole host of third-party mailers.  The conspiracy charged in the Indictment involved five or more people and was extensive.

## Cooperation of Alan Ralsky

In the plea agreement, Ralsky agreed to provide substantial assistance by agreeing to testify, if needed, against John Bown, William Neil, James Bragg, James Fite, and Anki Neil, and by working through his counsel and counsel for these defendants to persuade the remaining co-defendants of the need to accept responsibility and plead guilty rather than to go to trial. Ralsky provided the government with a complete and detailed debriefing of his illegal spamming operation and described the roles of the co-defendants.  Shortly after Ralsky was debriefed, the government began to be contacted by the attorneys for the other defendants who had not yet pled guilty, expressing their interest in settling the case.  Ralsky has agreed to testify if needed in the prosecution of others in connection with this case.  It should also be noted that Ralsky agreed to

be interviewed, and was interviewed, by attorneys from the Securities and Exchange Commission.  Finally, although not required to do so by the agreement, Ralsky provided information pertaining to other criminal activity.

The government believes that defendant Ralsky provided substantial assistance in the investigation of others.  As set forth in the PSR, the Probation Department calculates the guideline range as 70 - 87 months.  The defendant executed a written Rule 11 Plea Agreement that contained this same guideline range. Pursuant to that agreement, the government is making make a motion to reduce his sentence under 5K1.1 of the sentencing guidelines, as the government has determined that he provided substantial assistance.  Under the agreement, the government agreed that, if the defendant provided substantial assistance, the government would recommend a reduction in the guideline range to a range of 35 - 43 months.

By this memorandum the government brings to the attention of the court the facts pertaining to the defendant's offense and his subsequent cooperation.  The government believes that in this instance, the defendant did provide substantial assistance, and that, consequently, he is eligible for a reduction in the guideline range.  Therefore, the government does move pursuant to § 5K1.1 for a downward departure to a range of 35 - 43 months.

## CONCLUSION

For all of the reasons stated above, the government moves for a downward departure for defendant Alan Ralsky.

Respectfully submitted,

TERRENCE BERG
UNITED STATES ATTORNEY

/s/ Thomas Dukes
THOMAS DUKES
Trial Attorney
Computer Crime and Intellectual Property Section
Criminal Division

/s/ Mona Sedky Spivack
MONA SEDKY SPIVACK
Trial Attorney
Computer Crime and Intellectual Property Section
Criminal Division

DATED:  November 13, 2009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA**,

                Plaintiff,              **CRIMINAL NO.  07-CR-20627**

v.                                 **HON. MARIANNE O. BATTANI**

**D-1 ALAN M. RALSKY,**

                Defendant.

_____/

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on November 13, 2009, I electronically filed the foregoing document with the Clerk of the Court using the Electronic Case Management system.

                         s/Terrence G. Berg_____
                         United States Attorney
                         211 W. Fort Street, Suite 2001
                         Detroit, MI 48226
                         terrence.berg@usdoj.gov
                         Bar No. P40295

                         s/Cheryl Bradford_____
                         Legal Assistant
                         United States Attorney's Office